# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

MAXWELL C. GRAY, JR.,                    )
                                         )
            Plaintiff,                   )
                                         )
v.                                       )   Case No. 4:11-cv-03631-LSC-RRA
                                         )
CHS PRISON MEDICAL, et al.,              )
                                         )
            Defendants.                  )

## <u>MEMORANDUM OF OPINION</u>

Plaintiff, Maxwell C. Gray, Jr., has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging that rights, privileges, or immunities afforded him under the Constitution or laws of the United States have been abridged during his incarceration at St. Clair Correctional Facility in Springville, Alabama. Gray names as defendants Corizon, Inc., f/k/a Correctional Medical Services, Inc. ("CMS"), William Talley, M.D., and Colleen Oakes, R.N.[1] He seeks monetary and injunctive relief.

On February 24, 2012, the court entered an order for special report, directing that a copy of the complaint in this action be forwarded to the defendants and requesting that they file a special report addressing the factual allegations contained in the complaint. (Doc. 10.) The defendants were advised that the special report

---

[1] Gray incorrectly named Corizon, Inc. as CHS Prison Medical in his complaint.

should be accompanied by sworn statements and, if appropriate, would be considered as a motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. *Id*. By the same order, the plaintiff was advised that after he received a copy of the Special Report submitted by defendants, he should file counter-affidavits if he wished to rebut the matters presented by the defendants in the special report. *Id*.

On April 9, 2012, the defendants filed a special report accompanied by an affidavit and institutional records. (Doc. 18.) Plaintiff was notified that the defendants' special report would be construed as a motion for summary judgment and he would have twenty (20) days to respond by filing affidavits and other material if he chose. (Doc. 22.) Plaintiff was advised of the consequences of any default or failure to comply with Fed. R. Civ. P. 56. *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). Gray filed responses on May 2, 2012, and May 14, 2012. (Docs. 24, 25, & 27.)

On February 25, 2013, the defendants supplemented their special report. (Docs. 33 & 34.) Plaintiff responded to the defendants' supplemental special report on March 12 and 15, 2013. (Docs. 41 & 42.)

## I.   SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law. Summary

judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1989).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).

As the Eleventh Circuit Court of Appeals has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prime facie case.  "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the

dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment.   *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986).

## II.   SUMMARY JUDGMENT FACTS

Applying the foregoing summary judgment standard to the evidence before the court, the following facts appear to be undisputed or, if disputed, taken in a light most favorable to Mr. Gray.

Dr. William Talley is a physician licensed to practice medicine in the state of Alabama since 2010.  (Doc. 33, Talley Supp. Aff. ¶ 1.)  At all relevant times, Dr. Talley was employed by Corizon, Inc. as the Medical Director at St. Clair Correctional Facility.  *Id*.  Dr. Talley is no longer employed by Corizon, Inc.  *Id*.

On January 5, 2011, Dr. Talley examined the plaintiff for complaints of pain in his left arm, neck, and back.[2]  (Doc. 25, Gray Aff. at 1; Doc. 18, Attach. 16 at 2.) Gray told Dr. Talley that he had lost the use of his left arm and the pain in his neck and back "was like a hot knife."  (Doc. 25, Gray Aff. at 1.)  Dr. Talley ordered x-rays

---

[2]  Mr. Gray's medical records indicate he was seen on January 3, 2011.  (Doc. 18, Attach. 16 at 2.)

of Gray's cervical spine and left shoulder.  (Doc. 18, Attach. 16 at 2.)  Dr. Talley told

Gray he would send him for an MRI and prescribed him Ultram and Tylenol for pain.

*Id*.

On January 5, 2011, an x-ray was taken of Gray's cervical spine and left

shoulder.  ( Doc. 18, Attach. 16 at 20.)  The x-ray revealed mild degenerative joint

disease of the left shoulder but no fracture or dislocation.  (Doc. 18, Attach. 16 at 20.)

The x-ray also showed modest degenerative changes of plaintiff's cervical spine but

no fractures.  *Id*. at 21.

On January 14, 2011, the plaintiff presented again to the health department for

complaints of left shoulder pain.  (Doc. 18, Attach. 16 at 1.)  Dr. Talley noted no

atrophy.  *Id*.  Plaintiff was given a steroid injection and Dr. Talley recommended a

MRI of his cervical spine.  *Id*.

On January 24, 2011, Dr. Talley examined the plaintiff concerning his

continued complaints of pain.  (Doc. 18, Attach. 15 at 27.)  Dr. Talley noted that

Gray's neck pain radiated down to his left hand and that he experienced difficulty on

the hand grip.  *Id*.  Dr. Talley also noted that the plaintiff's appointment for an MRI

was pending.  *Id*.  Dr. Talley prescribed Ultram and Tylenol for 30 days and requested

a neurological consultation.  (Doc. 18, Attach. 15 at 25.)

On February 9, 2011, the plaintiff had an MRI of his cervical spine.  (Doc. 33,

Talley Supp. Aff. ¶ 19; Doc. 18, Attach. 10 at 8.)  The MRI revealed the following:

> The C2-3 level is unremarkable.  There is slight bulging at the C3-4 disc without central or neural foraminal narrowing.
>
> There is bulging of the C4-5 disc without further pathology.
>
> At C5-6 there is disc bulging.  There is uncovertebral disease and mild to moderate right bony neural foraminal narrowing.
>
> At C6-7 there is disc and osteophyte without cord compression.  There is mild right bony neural foraminal narrowing.
>
> The C7-T1 level appears unremarkable.
>
> The upper thoracic spine shows no further pathology.
>
> Impression: Disc degeneration and bulging, detailed above.

*Id*.

On February 23, 2011, Dr. Talley examined the plaintiff and renewed his prescription for Ultram and Tylenol.  (Doc. 18, Attach. 15 at 25.)  Dr. Talley told the plaintiff that he had read the MRI and he would be seen by a neurosurgeon.  (Doc. 25, Gray Aff. at 1.)

On March 9, 2011, Dr. Talley examined the plaintiff for complaints of pain.  (Doc. 18, Attach. 4 at 26.)  Dr. Talley noted that the request for Gray to be seen by a neurosurgeon was pending.  *Id*.  Plaintiff's prescription for Tylenol was discontinued, but he remained on Ultram.  (Doc. 18, Attach. 15 at 25; Attach. 4 at 26.)

On March 23, 2011, Dr. Talley saw Gray for a follow-up examination for his pain and renewed his prescription for both Ultram and Tylenol for 30 days. (Doc. 18, Attach. 4 at 25.)   Dr. Talley again noted that a neurosurgeon consultation was pending. *Id*.

On April 21, 2011, Dr. Talley examined the plaintiff for his complaints of pain. (Doc. 18, Attach. 4 at 24.) Dr. Talley ordered Gray to taper off of Ultram, and prescribed him Mobic and Tylenol for pain for 30 days. *Id*.  Gray's medical records show that a consultation with a neurosurgeon was still pending. *Id*.

On May 10, 2011, Dr. Talley saw the plaintiff for a follow-up examination. (Doc. 18, Attach. 4 at 23.)  Gray reported that he was doing well on Mobic. *Id*.  It was noted that medical staff would follow up on Gray's neurosurgeon consultation. *Id*.

On May 27, 2011, Dr. Talley again requested that the plaintiff receive a neurosurgeon consultation. (Doc. 18, Attach. 10 at 6.)  On May 29, 2011, Dr. Talley prescribed Tylenol 650 mg three times a day for 14 days for his pain.  (Doc. 18, Attach. 4 at 14.)

On June 2, 2011, Dr. Talley saw the plaintiff for a follow-up examination of his chronic neck and arm pain. (Doc. 18, Attach. 4 at 23.)  Dr. Talley noted that the neurosurgeon consultation was pending. *Id*.

On June 4, 2011, Dr. Hood denied Dr. Talley's request for a neurosurgeon consultation and instructed Hood to manage Gray's pain on site. *Id*. at 5. Dr. Hood further directed Dr. Talley to consider repeating the MRI of Gray's cervical spine in 2-3 months. *Id*.

On June 6, 2011, Gray presented to the infirmary with complaints of pain in his left shoulder. (Doc. 18, Attach. 4 at 22.) Dr. Talley ordered that he be given an injection of Toradol. *Id*. On June 17, 2011, Gray was examined and reported no new changes since his evaluation on June 2, 2011. *Id*. at 21. The plaintiff received Toradol injections for his pain on June 11, 17, and 21, 2011. (Doc. 18, Attach. 14 at 19.)

On July 12, 2011, Dr. Talley examined Gray for his chronic neck and arm pain. (Doc. 18, Attach. 4 at 21.) Dr. Talley noted that the plaintiff was unable to raise his left arm over his head and that there was atrophy of his left shoulder. *Id*. Dr. Talley determined again that Mr. Gray needed a neurosurgeon consultation for evaluation and review of his MRI. *Id*. Gray received Toradol injections for his pain on July 17 and July 20, 2011. (Doc. 18, Attach. 14 at 10.)

On August 3, 2011, Gray presented to the health department complaining of pain in his left shoulder. (Doc. 18, Attach. 4 at 20.) He described his pain level as an "8" on a scale of 1-10. *Id*. Medical staff noted that Mr. Gray's left arm was

swollen and warm to the touch.  *Id*.  He was given a Toradol injection.  *Id*.

On August 4, 2011, Dr. Talley gave Mr. Gray  a follow-up examination for his pain.  (Doc. 18, Attach. 4 at 19.)  Dr. Talley prescribed Vicodin. (Doc. 18, Attach. 4 at 19; Attach. 13 at 27.)

On August 15, 2011, Dr. Talley again requested a neurosurgeon consultation. (Doc. 18, Attach. 10 at 3.)  Dr. Talley noted that Gray had significant muscle atrophy and needed an urgent neurosurgery evaluation for possible treatment options.  *Id*. Also on August 15, 2011, the plaintiff was seen by Dr. Talley for chronic pain in his left shoulder and neck.  (Doc. 18, Attach. 4 at 19.)  It was noted that Gray had continued muscle wasting in his left arm.  *Id*.  His medical records indicate that a request for a neurosurgeon consultation had been "redone."  *Id*. Vicodin was prescribed for three days for pain.  *Id*.

On  August  16,  2011,  Dr.  Hood  approved  Dr.  Talley's  request  for  a neurosurgeon consultation.  (Doc. 18, Attach. 10 at 2.)  On August 25, 2011, Dr. Talley did a follow-up for neck and left arm pain.  (Doc. 18, Attach. 4 at 18.)  Dr. Talley  prescribed  Vicodin  for  three  days  and  noted  to  follow  up  with  the neurosurgeon consultation as directed.  *Id*.   On September 1, 2011, Gray was seen by Dr. Thomas L. Francavilla, a neurosurgeon, at Brookwood Hospital.  (Doc. 6, Amend. Compl. at 1; Doc. 33, Talley Supp. Aff. at ¶22.)  Upon examination, Dr.

Francavilla found that Gray had reduced range of motion in his neck.  (Doc. 18, Attach. 9 at 12.)  Gray also had severely reduced range of motion in his left shoulder, along with some pain in the AC joint.  *Id*.  Dr. Francavilla noted that his radicular symptomatology seemed quite severe.  *Id*.  Dr. Francavilla determined that a myelogram was necessary, as the plaintiff would be a surgical candidate if the test showed positive on the left side.  (Doc. 18, Attach. 9 at 12.)  Dr. Francavilla recommended that Gray undergo evaluation for his shoulder, but stated that it fell outside his expertise.  (Doc. 33, Talley Supp. Aff. at ¶ 22.)

On September 2, 2011, prison medical staff indicated that a myelogram was requested as well as an orthopedic consultation and follow-up with the neurosurgeon. (Doc. 18, Attach. 9 at 28.)

Dr. Talley examined Gray on September 8, 2011 for his pain and prescribed him Vicodin for three days.  (Doc. 18, Attach. 4 at 15.)

On September 15, 2011, a CT of Gray's cervical spine was performed with myelogram.  (Doc. 6, Amend. Compl. at 1; Doc. 18, Attach. 10 at 22.)  Gray was found to have moderate multi-level cervical spondylosis most prominent at the C5-C6 and C6-C7 levels.  (Doc. 33, Talley Supp. Aff. at ¶ 23.)

On September 21 and 29, 2011, Dr. Talley examined Gray for pain and prescribed Ultram on both occasions.  (Doc. 18, Attach. 4 at 13 & 14.)

On October 3, 2011, Gray was seen by Dr. Lindsey Dietrich at Cooper Green Hospital.[3]  (Doc. 25, Gray Aff. at 3.)  Dr. Dietrich recommended aggressive physical therapy of Gray's left shoulder to increase range of motion as well as rotator cuff strength.  (Doc. 25, Gray Aff. at 3; Doc. 18, Attach. 9 at 15-16.)  Dr. Dietrich told Gray that she preferred a neurosurgeon to perform Gray's neck and back surgery first, and ordered another MRI.  (Doc. 25, Gray Aff. at 3; Compl. at 3.)  When Gray returned to St. Clair, Dr. Talley informed him that he would not be approved for physical therapy.  (Doc. 25, Gray Aff. at 3.)

On October 5, 2011, Dr. Talley examined Gray and prescribed him Ultram for 3 days and Mobic for 14 days for his pain.  (Doc. 18, Attach. 3 at 14; Attach. 4 at 12.)

Colleen Oakes, R.N., was the Health Services Administrator ("HSA") at St. Clair Correctional Facility.  (Doc. 33, Oakes Aff. ¶ 1.)  Gray filed grievances until Nurse Oakes brought Gray before Deputy Warden Headley, Dr. Talley, Nurse Debra Sanders, and Mr. Wheat, and stated that she was tired of Gray signing up for sick call and filing grievances.  (Doc. 6, Amend. Compl. at 2.)  She informed Gray that his

---

[3]  Dr. Talley states in his affidavit that Mr. Gray was seen on this date by Dr. James G. Floyd at Cooper Green Hospital.  (Doc. 33, Talley Supp. Aff. ¶ 6.)  However, Mr. Gray states he was seen by Dr. Lindsey Dietrich and his medical records for this date were signed by Dr. Dietrich.  (Doc. 18, Attach. 9 at 15-16.)

Additionally, Mr. Gray refers to Dr. Dietrich as a "shoulder specialist" but it is most likely that Dr. Dietrich in an orthopedist since Mr. Gray was awaiting a consultation with an orthopedist.  (Doc. 25, Gray Aff. at 3.)

shoulder problem would not be addressed immediately.  *Id*.  She stated that Gray complained about his neck and back and that would be the priority.  *Id*.  Nurse Oakes also told Gray that Dr. Talley would not continue to give him pain medication and that Gray would have to tolerate the pain. [4] *Id*.  Deputy Warden Headley told Nurse Oakes that she needed to handle the matter through the medical provider and dismissed everyone.  (Doc. 25, Gray Aff. at 4.) Nurse Oakes later told Gray that in the future, all of his medical requests were to come to her and she would decide if they warranted Gray seeing Dr. Talley.  *Id*.  Shortly after this incident, Nurse Oakes was promoted and transferred.  *Id*. at 6.

On October 6, 2011, Gray returned to see Dr. Francavilla.  (Doc. 33, Talley Supp. Aff. at ¶ 24; Doc. 18, Attach. 9 at 11.)  After reviewing Gray's CT/myelogram, Dr. Francavilla found nothing on the left side of Gray's neck to cause his symptoms. *Id*.  He noted that Gray had significant right-sided foraminal stenosis at multiple levels but his symptomatic left side "look[ed] clean." Neither did Gray's MRI show any compression.  *Id*.  Dr. Francavilla recommended the following:

> The patient is under this interpretation that I have offered him surgical intervention.  Although he seems to have enough pain to consider surgery, I do not have a lesion for

---

[4]  Mr. Gray's medical records indicate his prognosis on this date was discussed "at length in Warden Headley's office" and a notation to "limit Ultram" was also documented.  (Doc. 18, Attach. 4 at 12.)

> which to try to correct.  Perhaps EMG/nerve conduction
> studies may give him some insight as to what is going on
> here.

*Id*.

On October 12, 2011, Dr. Talley requested an upper extremity EMG/NCV for

Gray, and Dr. Hood approved the procedure on October 18, 2011.  (Doc. 33, Talley

Supp. Aff. ¶ 7; Doc. 18, Attach. 9 at 7.)

On October 24, 2011, Dr. Talley examined Gray and noted that he was unable

to move his left shoulder.  (Doc. 18, Attach. 4 at 10.)  Dr. Talley prescribed Ultram

for 30 days.  (Doc. 18, Attach. 3 at 12.)  Dr. Talley  requested an MRI of Gray's left

shoulder, and Dr. Hood approved the MRI on October 26, 2011.  (Doc. 33, Talley

Supp. Aff. ¶ 8; Doc. 18, Attach. 9 at 2.)

A MRI of plaintiff's  shoulder was taken on October 31, 2011, and revealed the

following:

> Findings: This study was performed with intra-articular
> contrast.  The exam is slightly limited secondary to motion
> artifact.  The acromion in Type II in configuration.  AC
> joint appears unremarkable without rotator cuff
> encroachment.  Intermediate signal intensity is seen in the
> distal supraspinatus tendon in keeping with tendinosis.  No
> rotator cuff tear is visualized. There is no fluid or
> gadolinium seen in the subacromial/subdeltoid bursa.  The
> biceps tendon and glenoid labrum appear intact.
>
> Impression: Supraspinatus tendinosis.  Otherwise negative
> left shoulder MR arthrogram.

(Doc. 33, Talley Supp. Aff. ¶ 9; Doc. 18, Attach. 10 at 20.)

Pursuant to Dr. Francavilla's recommendation, Gray also underwent an EMG and nerve conduction study on October 31, 2011.  (Doc. 33, Talley Supp. Aff. ¶ 9; Doc. 18, Attach. 10 at 18.) The results were as follows:

> Interpretation:  This electromyography and nerve conduction study performed on the left arm demonstrates a chronic left C5-C6 radiculopathy.  The study also discloses extremely mild carpal tunnel syndrome on the left.

(Doc. 33, Talley Supp. Aff. ¶ 10; Doc. 18, Attach. 10 at 18.)

On November 3, 2011, Dr. Talley conducted a follow up examination of Gray's left shoulder pain.  (Doc. 18, Attach. 4 at 9.)  Gray reported an increase in pain at night when sleeping on his left side. *Id.*  Dr. Talley ordered that Gray continue taking Ultram for his pain. *Id.*

On November 21, 2011, Dr. Talley examined Gray for his left shoulder pain and renewed his prescription for Ultram.  (Doc. 18, Attach. 4 at 8.)  Dr. Talley requested an orthopedic follow-up appointment on November 21, 2011, and Dr. Hood approved the request on November 22, 2011.  (Doc. 33, Talley Supp. Aff. ¶ 11; Doc. 18, Attach. 8 at 27.)

On December 7, 2011, Dr. Thomas E. Powell, a Board Certified orthopedist, examined Gray.  (Doc. 33, Talley Supp. Aff. ¶ 12; Doc. 18, Attach. 8 at 22.)  Dr.

Powell noted that Gray had muscular atrophy on the shoulder posteriously and there was positive impingement and weakness and limited range of motion to about 60 degrees of abduction and forward elevation.  (Doc. 33, Talley Supp. Aff. ¶ 13; Doc. 18, Attach. 8 at 22.)   Gray's internal rotation was almost to his hip, and his neck was tender and painful.  *Id*.  Dr. Powell also noted that Gray had questionable positive Spurling's maneuver.  *Id*.  Dr. Powell recommended that since the MRI did not show a full thickness rotator cuff tear, it was reasonable to consider an arthroscopic exam. (Doc. 33, Talley Supp. Aff. ¶ 14; Doc. 18, Attach. 8 at 22.)

On December 8, 2011, Dr. Talley requested an arthroscopic exam, and Dr. Hood approved the exam on December 11, 2011.  (Doc. 18, Attach. 9 at 8.)

On December 15, 2011, Dr. Talley conducted a follow-up examination for the plaintiff's chronic neck and shoulder pain.  (Doc. 18, Attach. 4 at 7.)  Gray reported that he was doing well on Ultram.  *Id*.  Dr. Talley noted that Gray needed another consultation with a neurosurgeon.  *Id*.  Dr. Talley prescribed Ultram for 30 days. (Doc. 18, Attach. 3 at 11.)

On December 29, 2011, Dr. Talley requested that Gray be seen by a neurosurgeon for a follow-up consultation, and Dr. Hood approved the request on January 5, 2012.  (Doc. 18, Attach. 8 at 9.)

On January 12, 2012, Dr. Talley examined Gray for his chronic neck and left

arm pain.  (Doc. 18, Attach. 4 at 5.)  Dr. Talley prescribed Ultram for another 30 days. (Doc. 18, Attach. 5 at 5; Attach 3 at 11.)

On January 27, 2012, Gray was seen by Dr. Memerhi Okor, a neurologist, at the Kirklin Clinic. (Doc. 33, Talley Supp. Aff.  ¶ 27; Doc. 18, Attach. 8 at 6 & 7.)  Dr. Okor suggested a cervical 4-5, cervical 5-6, cervical 6-7 and anterior cervical diskectomy and fusion (ACDF).  *Id*.  Gray alleges Dr. Okor told him the surgery should have been performed earlier.  (Doc. 25, Gray Aff. at 7.)

On February 8, 2012, Dr. Powell performed the following surgical procedures on Gray: (1) arthroscopy of the left shoulder, with debridement of the labrum; (2) subacromial decompression; and (3) distal clavicle resection of 1-1.2 cm.  (Doc. 33, Talley Supp. Aff.  ¶ 15; Doc. 18, Attach. 7 at 27-28.)

On February 24, 2012, Dr. Okor saw Gray for his pre-operation appointment. (Doc. 33, Talley Supp. Aff. ¶ 28; Doc. 18, Attach. 7 at 13.)

On February 27, 2012, Dr. Powell examined Gray during a follow-up appointment.  (Doc. 33, Talley Supp. Aff. ¶ 16; Doc. 18, Attach. 7 at 1.)  Dr. Powell stated that Gray was doing fairly well and his pain was better.  *Id*.  He noted that Gray's motion was not good but he had not done anything from a therapy standpoint. *Id*.  His wounds were healed and the sutures were removed.  *Id*.  Dr. Powell stated that he would give Gray some exercises to perform and would see him as needed.  *Id*.

Dr. Powell also noted that Gray was to have neck surgery. *Id*. Gray alleges that the shoulder surgery did not correct the nerve damage. (Doc. 25, Gray Aff. at 6.)

On March 1, 2012, Gray was admitted to University of Alabama at Birmingham Hospital for surgery to correct his cervical spondylosis and cervical radiculitis. (Doc. 33, Talley Supp. Aff. ¶ 33; Doc. 18, Attach. 7 at 21.) Dr. Okor performed an anterior cervical diskectomy at the Levels C4-5, C5-6, and C6-7. *Id*. Dr. Okor also performed an anterior cervical arthrodesis at Levels C4-5, C5-6, and C6-7. *Id*. He placed a mechanical inter-body device at C4-5, C5-6, and C6-7. *Id*. Gray also had an interior internal fixation from C4-7 with Medtromic's Atlantis Translational plate. *Id*. Gray states that the surgery was successful as far as he can tell. (Doc. 25, Gray Aff. at 7.)

On March 21, 2012, Dr. Okor saw Gray for a follow-up examination. *Id*. at 7. Dr. Okor took x-rays and reported that Gray was doing well and for him to continue to wear his neck brace for comfort. *Id*. Gray reported that he had numbness in his shoulder, thumb and index finger. *Id*. Dr. Okor told him that he may need to see Dr. Powell again. *Id*. Dr. Talley advised Gray to wait a year. *Id*. Gray contends that if his neck and back surgery had been performed first, Dr. Powell could have successfully repaired his shoulder. (Doc. 25, Gray Aff. at 7-8.)

### III.   DISCUSSION

The United States Supreme Court has held that it is only deliberate indifference to serious medical needs which is actionable under 42 U.S.C. § 1983. *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983.  *See Bass v. Sullivan*, 550 F.2d 229, 230 (5th Cir. 1977).  Mere negligence is insufficient to support a constitutional claim.  *See Fielder v. Bossard*, 590 F.2d 105, 107 (5th Cir. 1979).   Moreover, an accidental or inadvertent failure to provide medical care, or negligent diagnosis or treatment of a medical condition, does not constitute a wrong under the Eighth Amendment.  *See Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).   Additionally, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.   Neither will a mere difference of opinion between an inmate and the institution's medical staff as to treatment and diagnosis alone give rise to a cause of action under the Eighth Amendment.  *See Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976); *see also Estelle,* 429 U.S. at 106-08.

Deliberate indifference can be shown in a variety of ways.  As the Eleventh Circuit Court of Appeals noted:

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference.  Medical

> treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference.

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (internal citations omitted).

An official also acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening or urgent medical condition that would be exacerbated by delay. *See Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186-87 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002); *see also Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994). Delay in access to medical treatment can violate the Eighth Amendment when it is "tantamount to 'unnecessary and wanton infliction of pain.'" *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations omitted).

A medical need is considered serious when delay results in an inmate suffering "a lifelong handicap or permanent loss." *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987). An inmate claiming an unconstitutional delay in medical treatment "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Hill*,

40 F.3d at 1188, *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

Gray complains that defendants delayed necessary surgeries for his neck, back, and shoulder.  He was in constant pain and alleges that he had to sign up for sick call frequently to obtain pain medication.  Gray contends that doctors have informed him that the damage to his neck, back, and shoulder would not have been as severe if surgery had been performed sooner.

Viewing the facts in a light most favorable to Gray, the pain in his neck, back, and shoulder constituted a serious medical need.  However, Gray has not shown that defendants were deliberately indifferent to that need.  The undisputed medical evidence shows that from January 2011 until plaintiff's surgeries in 2012, Dr. Talley examined Gray, prescribed him pain medication, and requested various diagnostic procedures and consultations with outside specialists in response to Gray's complaints of pain in his neck, back, shoulder, and arm.  The medical record is devoid of evidence that Dr. Talley had subjective knowledge of, and disregarded, a risk of serious harm to Gray due to his chronic pain.  To the contrary, the record establishes that Dr. Talley regularly examined Gray and treated him.  There is no evidence that Dr. Talley ever refused to treat Gray or was otherwise deliberately indifferent to Gray's medical condition.

Gray complains that medical staff denied an earlier request for him to be seen

by an outside neurosurgeon and did not comply with Dr. Dietrich's recommendation that he have physical therapy for his shoulder.  It is undisputed that on June 4, 2011, Dr. Hood initially denied Dr. Talley's request that Gray be seen by a neurosurgeon and directed Dr. Talley to treat Gray's condition on site and consider another MRI in two to three months.  However, the fact that Gray disagrees with the efficacy of the treatment recommended or simply preferred a different course of treatment does not state a constitutional claim.  Indeed, "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis and course of treatment [does not] support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  Neither does a simple difference in medical opinion between doctors constitute deliberate indifference.  *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989). Despite medical staff's failure to provide Gray with physical therapy as recommended by Dr. Dietrich, he continued to be treated with pain medication and was approved for consultation with an orthopedic surgeon to correct his shoulder condition.

Moreover, there is no evidence that the treatment provided to Gray was "so grossly incompetent, inadequate, or excessive as to shock the conscience." *Adams*, 61 F.3d at 1544-45 (whether governmental actors "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for

medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment") (quoting *Estelle*, 429 U.S. at 107). The Eleventh Circuit Court of Appeals has recognized that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop,* 871 F.2d at 1035. Even if the facts supported an inference that medical staff were negligent in treating Gray's neck, back, and shoulder pain, "[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations." *Harris*, 941 F.2d at 1505.

Gray complains that Nurse Oakes told him she was tired of him filing grievances, that Dr. Talley would not be allowed to prescribe him pain medication, and she was not concerned with getting Gray's shoulder problem corrected because he complained about his neck and back and, therefore, those would be the priority. Taking Gray's allegations as true, there is no evidence in the record that any of Nurse Oakes' comments had any bearing on Gray's medical care. Dr. Talley continued to examine Gray on a regular basis and continued to prescribe him pain medication. There is no evidence that Nurse Oakes was responsible for providing direct medical care to Gray. Gray's medical records indicate that for a short period of time, Dr. Talley did not prescribe Ultram and he did not prescribe pain medication for 30-day periods. However, Dr. Talley did continue to prescribe Gray other pain medications

such as Tylenol and Mobic when Gray presented to the medical department.  Dr. Talley also ordered Toradol injections when needed.  Gray does not allege that Dr. Talley ever denied him medication when he presented to the medical department. Additionally, Dr. Hood approved Dr. Talley's request for Gray to be seen by an orthopedist concerning his shoulder pain, and Gray received surgery for his shoulder, despite Nurse Oakes' statements.

Gray alleges that if the defendants had not delayed in approving surgery for him, the damage to his neck, back, and shoulder would have been less severe. However, Gray has failed to introduce verifying medical evidence that any damage to his neck and shoulder is a direct result of the defendants' delay in obtaining medical treatment for him.  *See Hill*, 40 F.3d at 1188, *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002).

Based on the foregoing, Defendants Corizon, Inc., Dr. William Talley, and Nurse Colleen Oakes' motion for summary judgment on Gray's Eighth Amendment medical care claims is due to be granted and those claims dismissed with prejudice. To the extent the plaintiff attempts to assert state claims, such claims are due to be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

A final judgment in accordance with this memorandum of opinion will be entered.

Done this <u>19th</u> day of <u>March 2013</u>.

                    L. SCOTT COOGLER
          UNITED STATES DISTRICT JUDGE
                                 [160704]